DECISION AND JOURNAL ENTRY
The Summit County Court of Common Pleas affirmed a decision of the Stow City Council ("Council"), which denied final plat approval and a conditional zoning certificate for a subdivision that Court Street Development planned to build. Court Street Development, and Victor Cohn, Trustee, (collectively "Court Street") have appealed from the judgment of the trial court.
Court Street has asserted that the trial court erred when it (1) denied Court Street's motion to introduce additional evidence during the administrative appeal; (2) refused to conduct a de novo
hearing; (3) affirmed Council's decision when it was not supported by the evidence; and (4) determined that the denial of the application for a conditional zoning permit did not violate Court Street's constitutional rights. We overrule all four assignments of error and affirm the judgment of the trial court.
 I
The zoning code of Stow conditionally permits a Planned Unit Development ("PUD") to be established in an R-1 Residence District. Stow Codified Ordinances 1167.01. PUDs allow owners of sites twenty acres or larger to employ innovative site planning, in order to preserve naturally occurring features, such as woodlands or water bodies, and to plan for common recreational areas and facilities. Stow Codified Ordinances 1167.01 and 1167.03. Within a PUD, a developer may vary the lot size and setbacks downward from what is otherwise required in the district. Stow Codified Ordinances 1167.04(b)-(c). In exchange for this flexibility, the PUD must devote at least twenty percent of the site to "open space, preservation areas, recreational areas or recreational facilities," and may not exceed eighty percent of the number of lots that could otherwise be constructed on that same number of acres.[1] Stow Codified Ordinances 1167.04 (d) and (a).
Court Street owns a ninety-three acre site in an R-1 district, containing approximately twenty-five acres of wetlands. Court Street proposed developing Springbrook Reserve as a PUD on this site, which it purchased approximately twenty-five years ago. The proposed PUD would have three entrances to the site from adjacent roads. One hundred fourteen of the 121 lots would front on internal streets, and the remaining seven would front on one of the adjacent roads. In response to objections to an earlier proposal,[2] Court Street brought the lots on the perimeter of the PUD into compliance with the R-1 restrictions. The average lot size within the proposed Springbrook Reserve PUD is 17,600 square feet, with the minimum lot size being 15,000 square feet. In an R-1 District, lots must be a minimum of 20,000 square feet.
The Stow Planning Commission approved Court Street's application for a conditional zoning certificate. The Stow Planning Commission subsequently gave approval to the final plat. During this approval process, four hearings were held, at which testimony was taken. Residents testified that previous developments had caused flooding problems in the area, which had not yet been abated. They raised the concern that a new PUD would exacerbate the existing flooding. In addition, residents expressed concerns about whether the wetlands would be disturbed by the plan to use them as a drainage basin, and whether they were sufficient to contain the resulting runoff.
The residents also testified about the existing character of the area, which Court Street hopes to develop as a PUD. Springbrook Reserve is "surrounded by existing residential neighborhood of a specific character. In the City of Stow that's a very rural character that is not similar to the subdivisions and the cookie-cutter allotments that otherwise exist." Several of the neighbors of the proposed PUD still farm their land, and most of the lots in the area are oversize. The roads were described as narrow two lane roads that might be unable to handle the increased traffic from 121 homes.
Court Street hired GBC Design to conduct a study of the drainage for the proposed development. Gary Rouse testified, on behalf of GBC Design, that he made computations based solely on "10 Year Stormwater Discharges" map and chart. The map, contained in the record as an exhibit, indicates the discharge rate at numerous points throughout the two districts that the proposed development overlaps. Those rates represent discharge from a storm of a severity that would normally only occur once every ten years. The map appears to pre-date the development of Eastwicke Farms because roads within the area designated as Eastwicke Farms are absent from the drainage map, even though the map does depict other roads.
Based on the drainage map, GBC Design concluded that as long as the water was desilted before entering the wetlands, the plan to use the wetlands for retention or detention of stormwater runoff made good engineering sense. The total discharge for the area, based on two key drainage points, was multiplied by the ratio of the area to be developed to the total drainage area. On that basis, it was projected that the runoff from the 58.8 developed acres would be 17 cubic feet per second. According to GBC Design, the planned detention/retention basins were sufficient to prevent any increase in this peak rate of stormwater run-off. Gary Rouse, from GBC Design, testified that that he was unaware of the existing flooding in the area when he made the computations based solely on a drainage map. Both Eastwicke Farms and the proposed Springbrook Reserve drain into the same culvert at Newcomer Road.
With respect to the wetland area, Court Street obtained permission from the Army Corps of Engineers ("ACE") to fill in approximately .255 acres in one portion of the wetlands on the parcel. In addition, the ACE imposed six requirements on Court Street that were designed to maintain the character of the wetlands both during and following development of the surrounding property.
Finkbeiner, Pettis and Strout, Inc. ("FPS") conducted an on-site traffic study to determine the impact of 121 new homes. The study was based on the expected number of trips per day per home and the expected traffic pattern for individuals exiting the development. FPS projected that traffic on Newcomer Road would increase by 9.7% a day, adding one vehicle per cycle during peak hours of operation at the intersection of Graham Road and Newcomer Road. Traffic on Call Road would likely increase 31.58%, and FPS projected that "there will be fewer gaps in the traffic stream on Call Road for access at side roads and driveways." Despite the potential inconvenience for residents on or near Call Road, "the existing facility can serve many more vehicles" than are currently being served. In response to concerns raised, FPS found that the sight distance at the proposed access road locations exceeded the minimum required.
During the numerous public hearings, residents raised other concerns to which Court Street responded. In response to concerns that the dewatering needed during construction would lower the water table and affect nearby wells, Environmental Design Group indicated that the area of impact of the temporary dewatering would not include any of the surrounding residential properties or affect the viability of the wetlands. In response to concerns that the PUD would increase the density in the area, Court Street created a plan that included strict compliance with the R-1 zoning.[3] That proposal eliminated much of the open space, and included 127 homes. Because it is in compliance with R-1 restrictions, Court Street would not need to seek a conditional use permit if it were to implement that plan.
After two hearings, at which it accepted testimony, Council rejected the final plat and conditional zoning certificate. It found that Court Street "failed to meet the criteria established in Section 1167.02, Codified Ordinances of Stow, for approval of a planned unit development, particularly Section 1161.02, subsection c." In addition, it found that it did not meet Section 1161.02, subsection d, and Section 1167.02, subsection a.
Over the course of the hearings, several comparisons were made to Eastwicke Farms, a neighboring PUD. The average lot size of the Eastwicke Farms PUD is 18,890 sq. ft., with 194 lots covering approximately one hundred ten acres and containing "substantially less open space." Eastwicke Farms was the first PUD in the vicinity. There was testimony that the flooding drastically increased in the area after Eastwicke Farms was developed. The net density of each development, excluding wetlands, is slightly over 2 units per acre, and the two have similar frontage and setbacks.
 II Introduction of Additional Evidence
In its appeal to the trial court, Court Street challenged the decision of Council as arbitrary, unreasonable, and unsupported by the preponderance of the evidence. In addition, Court Street asserted that the denial of the conditional use permit was unconstitutional, as applied to this particular proposed use.
Council does not have the authority to determine issues of constitutionality. Mobil Oil Corp. v. Rocky River (1974), 38 Ohio St.2d 23,26. Even though the body making the initial decision could not have decided the issue, R.C. 2506.04 specifically permits the trial court to "find that the order, adjudication, or decision is unconstitutional." In addition, the question of the constitutionality of a zoning decision may also be raised either by direct appeal, or by an action for declaratory judgment.Karches v. Cincinnati (1988), 38 Ohio St.3d 12, paragraph one of the syllabus.
Regardless of the substance of the administrative appeal, Chapter 2506 of the Revised Code governs administrative appeals. See Willoughby Hills v. C.C. Bar's Sahara, Inc. (1992), 64 Ohio St.3d 24,26. Pursuant to R.C. 2506.01, the appeal proceeds "as provided in Chapter 2505 of the Revised Code, except as modified by this chapter." The introduction of new evidence is generally barred in an appeal, and Chapter 2505 of the Revised Code does not explicitly permit the introduction of new evidence when the procedures of Chapter 2505 of the Revised Code govern an appeal to the trial court of an administrative procedure. R.C. 2506.03
modifies the process articulated in Chapter 2505 to permit the introduction of new evidence under limited circumstances. Although a review pursuant to Chapter 2506 is generally explicitly confined to "the transcript as filed," the introduction of new evidence is permitted where it is apparent from "the face of the transcript" or it is demonstrated by affidavit that one of five exceptions apply. R.C. 2506.03. The five exceptions include that (1) the transcript is an incomplete record of all the evidence; (2) the appellant was not permitted to appear in person, or through counsel, with respect to the final adjudication and was thus denied the opportunity to present or defend its case; (3) the testimony contained therein was not given under oath; (4) the appellant was unable to present evidence because it lacked the power of subpoena; or (5); conclusions of fact supporting the order being appealed were not filed.
Court Street does not contend that any of these five exceptions apply; rather it contends that new evidence is permitted because its appeal to the trial court challenged the constitutionality of the zoning ordinance as applied in this particular decision. In drafting the Chapter of the Revised Code, which permits an appeal from an administrative hearing, the General Assembly clearly contemplated challenges to the constitutionality of decisions made by administrative bodies. See R.C. 2506.04. Even though it contemplated challenges of this nature, the General Assembly chose not to draft an exception to its general mandate that such appeals be confined to the transcript, in order to permit the introduction of additional evidence. See R.C. 2506.03. In most instances, the record is sufficient for a challenge to the constitutionality of the decision of an administrative agency. See Jorgenson v. Huron Bd.of Bldg. Zoning Appeals (Sept. 5, 1980), Erie App. No. E-79-45, unreported. Challenges that require reference to evidence outside of the administrative record may be made in an action for declaratory judgment. See Karches, 38 Ohio St.3d at 16, noting that a declaratory judgment action may question the constitutionality of the prohibition of a specific proposed use. While Court Street was free to challenge the constitutionality of Council's decision, because it did so by means of an appeal to the trial court it was limited to the evidence contained in the administrative record.
Court Street's first assignment of error is overruled.
 Retrial de novo
Court Street has asserted that the trial court erred by refusing to "rehear and retry the cause de novo, but rather reviewed the decision of Council solely on questions of law." The review provided for administrative appeals is not de novo.Dudukovich v. Housing Auth. (1979), 58 Ohio St.2d 202,206-207.[4] An appeal, pursuant to R.C. 2506.01 involves the examination and weighing of "the `substantial reliable and probative evidence on the whole record,'" and the additional evidence admitted pursuant to R.C. 2506.03." Id. at 207. On review, a lawful decision that is supported by "a preponderance of reliable, probative and substantial evidence" must be affirmed.Id.
Court Street has agreed that "the Court of Common Pleas weighed the evidence, giving due deference to Council's resolution of evidentiary conflicts and determined that the decision on review of the record was supported by reliable, probative, and substantial evidence." We have already determined that additional evidence was not admissible pursuant to R.C. 2506.03. In the absence of such evidence, the review described by Court Street, and performed by the trial court, is precisely the review articulated by the Supreme Court of Ohio in Dudukovich.
Court Street's second assignment of error is overruled.
 Decision Not Supported by the Evidence
Court Street has asserted that Council's decision to deny their request for a conditional use permit "was not supported by a preponderance of substantial, reliable and probative evidence on the whole record." Council determined that the planned PUD did not comply with the conditions that are a prerequisite for the granting of a conditional use permit. Specifically, Council determined that there was not adequate evidence that the Court Street plans satisfied the following condition:
 Uses within the proposed PUD shall be located so as to reduce any adverse influences and to protect the residential character of areas both within and adjacent to the PUD.
Stow Codified Ordinances 1167.02(a). Council also found the plans by Court Street failed to satisfy two other criteria:
 The conditional use will be designed, constructed, operated and maintained so as to be harmonious and appropriate in appearance with the existing or intended character of the general vicinity, and that such use will not essentially change the character of the same area;
 The conditional use will not be hazardous or disturbing to the use and enjoyment of property in the immediate vicinity for the existing and future uses permitted, nor substantially diminish or impair property values within the neighborhood.
Stow Codified Ordinances 1161.02 (c) and (d).
In deciding an appeal from an administrative body, the Court of Common Pleas must weigh the evidence "to determine whether there exists a preponderance of reliable, probative and substantial evidence to support he agency decision." Dudukovich,58 Ohio St.2d at 207. If the trial court finds a preponderance of reliable, probative and substantial evidence exists, the court may not "blatantly substitute its judgment for that of the agency," but must affirm the decision of the administrative body. Id. It is an abuse of discretion, and reversible, for the trial court to affirm a decision of an administrative agency when, as a matter of law, it was not supported by a preponderance of reliable, probative, and substantial evidence. Kisil v. Sandusky (1984),12 Ohio St.3d 30, 34 and fn. 4.
Court Street has argued that it presented the only reliable and probative evidence, because the testimony of the residents opposed to the conditional use consisted of "unfounded fears" of individuals "determined to thwart development." See Adelman RealEstate Co. v. Gabanic (1996), 109 Ohio App.3d 689, 694. Much of the testimony of the residents can accurately be characterized in that manner, however in many instances those opinions also contained relevant facts.
Neighbors to the proposed development testified as to existing flooding problems which arose from, or were greatly increased by, the development of the Eastwicke Farms PUD. Eastwicke Farms and the proposed Springbrook Reserve both drain into the same culvert at Newcomer Road. Despite efforts to resolve the Eastwicke Farms flooding, the problem remains. GBC Design conducted a drainage study, based on a drainage map, which indicated that the planned retention/detention basins would be able to manage the water flow to prevent any increase in stormwater runoff from the development. The individual who performed the study was unaware of, and did not take into account, the already existing flooding. According to the testimony of the residents, and not contradicted by any other testimony, City Engineers had evaluated the Eastwicke Farms plans and, prior to its development, had predicted that it would not cause flooding problems either.
Neighbors expressed concern about increased traffic. In response to these concerns, a traffic study was done. Although the increase in traffic was minimal on one of the exit roads, traffic on the second exit road would increase by nearly a third. The study concluded that the narrow two-lane road could handle the increased traffic, but predicted that there would be fewer opportunities to enter into the stream of traffic for residents on Call Road, and on the side streets that exit onto Call Road.
Finally, there was testimony as to the existing character of the neighborhood. Although the area is zoned R-1, and could be entirely composed of 20,000 square foot lots, that is not its current composition. The neighborhood was described as semi-rural, with large lots. Some of the neighbors still actively farm their property. Lots close to Springbrook Reserve are generally measured in acres, rather than the fractions of an acre proposed for lots within Springbrook Reserve.
Council determined that the PUD did not satisfy three specific requirements for approval as a conditional use. First, it determined that "the developer failed to provide sufficient evidence that the proposed planned unit development will not have an adverse influence on the residential character of the adjacent landowners," and thus did not comply with Stow Codified Ordinances 1167.02; supra at. This appears to be a misstatement of the ordinance, and is unsupported by the evidence. The ordinance directs the Planning Commission and Council to consider whether "[u]ses within the proposed PUD" are "located so as to reduce any adverse influences and to protect the residential character of areas both within and adjacent to the PUD." The use of the phrase "uses within" indicates that the factor to be considered is not the PUD in its entirety, but components of the PUD with respect to their effect on the residential character of both the PUD and the surrounding community. A plain reading of the language of the ordinance is that the administrative bodies are to evaluate the location of components within the PUD so that the particular uses do not impinge on the essential character of the neighborhood as a residential district. The evidence focused almost exclusively on the impact of the PUD, as a whole, on the surrounding area. There was no evidence that any specific uses within the PUD were inconsistent with or harmful to the residential character of either the PUD or the adjacent portions of the residential district. As a matter of law, this conclusion of fact is unsupported by a preponderance of the evidence.
Council also determined that the PUD was not designed so as to be harmonious with the existing or intended character of the general vicinity, or that it would essentially change the character of the same area. See Stow Codified Ordinances 1161.02(c). As the ordinance is written, see supra at , the PUD must be harmonious with either the existing or intended character of the general vicinity and it must not essentially change the character of the same area. The legislative body that created the Stow zoning scheme deliberately included the ability to develop PUDs in R-1 districts. As such, the intended character in any R-1 district containing large undeveloped sites includes the existence of PUDs. The second portion of the ordinance focuses not on the intended character, but on the existing character. With the exception of Eastwicke Farms, which exits onto one of the adjacent roads, there was credible, probative evidence that general vicinity is largely undeveloped and consists of a mixture of working farms and large residential lots. It was not wrong, as a matter of law, for Council to determine by a preponderance of the evidence that the creation of a development containing 121 lots, with an average size of 17,600 square feet would essentially change the character of the general vicinity.[5]
Finally, Council determined that the conditional use would either be hazardous or disturbing to the use and enjoyment of property in the immediate vicinity for either the existing or the future use, or that it would substantially diminish or impair property values within the neighborhood. Both flooding and increased traffic can reasonably be described as disturbing to the use and enjoyment of the property in the immediate vicinity. The evidence regarding the increased traffic was uncontradicted. A traffic study predicted a 31.58% increase in traffic on one of the narrow two-lane streets that border the planned development. The study also indicated that there would be "fewer gaps in the traffic stream * * * for access at side roads and driveways." With respect to the flooding, there was direct evidence that flooding is an existing problem. The expert who evaluated the planned development with respect to flooding was unaware, when he completed the study, that there was existing flooding. When provided with that information, he did not indicate whether this new knowledge altered his assessment of the risk of increased flooding. The expert's evaluation was premised on the capability of retention/detention basins to hold the floodwaters from the development for controlled release. It is a reasonable inference that basins that are capable of permitting controlled release of anticipated floodwaters from the proposed development might still be insufficient to permit controlled release of both the existing floodwaters and the anticipated additional floodwaters. This is particularly true since the drainage map on which he based his assessment is undated, but appears to have been created before the development of Eastwicke Farms. Council's determination that there was insufficient evidence to establish that the PUD would not be hazardous or disturbing to the use and enjoyment of the property in the immediate vicinity, premised on the uncontradicted evidence regarding traffic and on the unanswered questions about flooding, was not incorrect as a matter of law.
Council made three findings of fact supporting its decision. By its affirmation of Council's decision, the trial court determined that Council's findings of fact were supported by the preponderance of reliable, probative and substantial evidence. Although one of the findings of fact was incorrect, as a matter of law, the remaining two were not. As a result, the trial court's affirmation of Council's decision was not an abuse of discretion, and will not be reversed.
 D. Constitutionality of Ordinance, as Applied
Court Street has asserted that the denial of its request for a conditional use permit was unconstitutional because (1) it deprived the owner of the right to devote the property to its lawful use as zoned; (2) the decision failed to substantially advance a legitimate government interest; and (3) the decision violated Court Street's right to equal protection, because other similarly situated developers were granted the conditional use permit that Court Street was denied.
 Deprivation of Lawful Use of Property
A conditional use is one authorized by law, on the meeting of certain conditions. Council determined that the development Court Street proposed had not met those conditions, and thus did not comply with the zoning regulations. This court has reviewed, and affirmed, the trial court's affirmation of the decision of Council. Because Court Street did not meet the prerequisite conditions, the use it proposed for the property was not authorized by law. Court Street was not denied the lawful use of its property; Council determined that the use was not lawful and denied it on that basis.
 2. Restriction on Land Use Must Advance a Legitimate Government Interest
Court Street has asserted that the decision, which it characterized as "requiring strict adherence to the area limitations permitted in the R-1 District," was unconstitutional. Initially, we note that the decision did not require strict adherence to the R-1 area limitations; Council determined that Court Street did not meet the prerequisite conditions that would permit it to vary from strict adherence to the R-1 limitations. As examined earlier, the decision made by Council was one authorized by the zoning regulations. Because of this, the issue is whether the zoning regulations permitting Council to deny Court Street a conditional use permit are unconstitutional, with respect to this particular property.
The Supreme Court of Ohio has held that in "an appeal, pursuant to R.C. Chapter 2506, which challenges the constitutionality of a zoning ordinance as applied, the issue for determination is whether the ordinance, in proscribing a landowner's proposed use of his land, has any reasonable relationship to the legitimate exercise of police power by the municipality." Mobil Oil Corp. 38 Ohio St.2d 23 at syllabus. The use proposed by Court Street would have increased traffic by nearly a third on one of the boundary streets, leading to fewer gaps in traffic for cars to enter the stream of traffic. It is unclear whether the proposed development would have increased flooding. The expert hired by Court Street did not take into account the existing flooding and based his calculations on a map that was apparently created before the existence of a neighboring development, which empties into the same drainage culvert. In addition, although the planned development might be harmonious with a fully developed R-1 unit, it would change the existing character of what is currently primarily a big lot, semi-rural portion of Stow. The evidence related to these three concerns supports Council's determination that the proposed development did not meet the prerequisite conditions. Premising conditional use of this particular parcel of property on the creation of a plan that satisfactorily addresses flooding and traffic concerns and that will not essentially change the neighborhood into which it is placed has a reasonable relationship to a legitimate exercise of police power.[6] The zoning regulations are not unconstitutional, as applied by Council, to this particular request for a conditional use permit.
 3. Equal Protection
Court Street has argued, generally, that because Council approved every other requested PUD and, specifically, that because it approved the Eastwicke Farms PUD it violated the Equal Protection Clause of the United States Constitution when it denied a conditional use permit to Springbrook Reserve. The challenged decision does not implicate a fundamental right or a suspect classification. See Armendariz v. Penman (C.A. 9 1996),75 F.3d 1311, 1326. Because of this, it need only bear a rational relation to a legitimate state interest. New Orleans v. Dukes
(1976), 427 U.S. 297, 303-304, 49 L.Ed.2d 511, 517. The zoning regulations permitted Council to reject the PUD proposed by Court Street if it would change the character of the neighborhood, or if it would impair the quality of life in the vicinity by such things as increased flooding or traffic congestion. Council determined that the PUD might do both and denied the conditional use permit. When it approved the Eastwicke Farms PUD, Council apparently determined that it did not present the same problems. The distinction Council made between two physically similar developments based on the impact each would have on the surrounding community bears a rational relationship to a legitimate state interest, and thus was not a violation of Court Street's right to equal protection under the law.
 Summary
Because Council properly determined that Springbrook Reserve did not comply with the conditions that were a prerequisite for obtaining a conditional use permit, it was not deprived of the lawful use of its property. The restrictions, pursuant to which Council rejected Court Street's proposed development, bore a reasonable relationship to the legitimate exercise of police power by the municipality. Finally, the decision to deny Court Street's proposed conditional use, even though ostensibly similar ones had been previously granted, did not violate Court Street's right to equal protection under the law because the impact of a development on the surrounding community bears a rational relationship to the legitimate state interest of controlled development. Court Street's fourth assignment of error is overruled.
 III
Court Street's first assignment of error is overruled because even though the relevant statutes permit the introduction of new evidence on appeal, the trial court properly determined that the circumstances under which new evidence could be introduced were not present in this case. Because the trial court used the proper standard of review, Court Street's second assignment of error is overruled. Court Street's third assignment of error is overruled because the trial court properly affirmed the decision of Council as supported by the evidence. The decision by Council did not deprive Court Street of the lawful use of its property, was not an unreasonable restriction on its use, nor did it violate its right to equal protection under the law. Court Street's fourth assignment of error is overruled. The judgment of the trial court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellants.
Exceptions.
 ___________________________ WILLIAM R. BAIRD
FOR THE COURT, SLABY, J., BATCHELDER, J., CONCUR.
[1] Several residents "testified" that the PUD guidelines permitted developers to put more lots on any given parcel of property. The ordinances, however, appear to cap the number of developed lots within a PUD at twenty percent fewer than would be permitted in a traditional R-1 development. The maximum number of lots that may be created within an R-1 PUD is equal to eighty percent of the total acreage divided by the minimum R-1 lot size of 20,000 sq. ft. Stow Codified Ordinances 1167.04(a) and 1143.03. For example, in a twenty-five acre site, the 1,098,000 sq. ft. could be used to create an R-1 development of approximately 54 lots (1,098,000/20,000) or a PUD development of approximately 44 lots (1,089,000 x .8/20,000).
[2] Council similarly rejected that proposal, and the appeal from it appears to have been pending in the trial court at the time of the May 27, 1997 hearing on the amended proposal.
[3] See supra fn.
[4] Dudukovich v. Housing Authority (1979), 58 Ohio St.2d 202, was decided before the General Assembly revised portions of Chapters 2505 and 2506 of the Revised Code. As relevant to this assignment of error, the statute analyzed in Dudukovich was not substantively different than the current statute.
[5] A development containing a similar number of lots of only marginally larger size could be developed in strict compliance with the R-1 restrictions. Because such a development is not required to obtain a conditional use permit, it would not be subject to the restriction that it not change the character of the general vicinity.
[6] It is true that a similar development in strict compliance with the R-1 restrictions could be built on the same property. It is likely that any similarly concentrated development would give rise to similar concerns, yet would not need specific approval by Council. It is worth noting, however, that Court Street has owned the property for twenty-five years, and has engaged in a lengthy, multi-level struggle to get a conditional use permit, rather than build a strict R-1 development. It was reasonable to structure the regulations governing PUDs so that a semi-rural neighborhood, which is not otherwise an attractive site for concentrated development, is not drastically changed by the insertion of a concentrated development, made attractive to developers only because of less stringent zoning restrictions.